UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DENISE L. COLLINS,

             Plaintiff,

    v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

             Defendant.

Civil No. 3:13-cv-01311-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Denise L. Collins ("Collins"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 USC §§ 401-33. This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons set forth below, that decision is reversed and remanded for an immediate award of benefits.

1 – OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Collins originally filed for DIB in July 2006[1] alleging a disability onset date of February 14, 2005. Tr. 219-25.[2] Her application was denied initially and on reconsideration. Tr. 120-27. On July 14, 2009, after holding a hearing, Administrative Law Judge ("ALJ") Richard A. Say denied her application, finding her capable of performing her past relevant work. Tr. 98-109.

Collins filed again for DIB on August 21, 2009. Tr. 110. On April 6, 2011, the Appeals Council vacated the ALJ's decision, consolidated the two claims, and remanded for a new hearing to consider Collins's mental health impairment. Tr. 111-13. At a second hearing on December 5, 2011, Collins, Sandra Stoner, and a Vocational Expert ("VE") testified. Tr. 39-72. The ALJ issued an unfavorable decision on December 20, 2011. Tr. 16-31. On June 6, 2013, the Appeals Council denied Collins's request for review. Tr. 1-5. Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court. 20 CFR §§ 404.981, 422.210.

## BACKGROUND

Born in 1956, Collins was 55 years old at the time of the second hearing. Tr. 65, 219. She has a GED and past relevant work experience as a paralegal for the Amalgamated Transit Union ("Union") beginning in February 1993. Tr. 65, 67, 232, 243. She stopped working on February 14, 2005, due to extreme neck pain and fatigue. Tr. 42. At the second hearing, Collins amended her application to the closed period of February 14, 2005, to April 26, 2010, the date she resumed work with her former employer. Tr. 19. Collins

---

[1] The ALJ gives a filing date of March 15, 2006, but without citing the record. Tr. 101.
[2] Citations are to the page(s) indicated in the official transcript of the record filed on December 2, 2013 (docket #9).

alleges that she was unable to work during that closed period due to the combined impairments of fibromyalgia, cervical radiculitis and stenosis, tendonitis, and hepatitis C. Tr. 224, 253.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 404.1520; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her

impairments.  20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 404.1520(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 404.1520(a)(4)(v) & (g).

## ALJ'S FINDINGS

The ALJ found that Collins met the insured status requirements of the Social Security Act through December 31, 2010.  Tr. 21.  To obtain DIB, Collins must prove that her disability existed on or before her date last insured ("DLI").  *See Tidwell v. Apfel*, 161 F3d 599, 601 (9th Cir 1998).

At step one, the ALJ concluded that Collins has not engaged in substantial gainful activity during the close period between February 14, 2005 and April 26, 2010.  Tr. 21.

At step two, the ALJ determined that Collins has the severe impairments of "congenital fusion, in cervical spine post-surgery, fibromyalgia, left shoulder bone infarction, hepatitis C, headaches, diabetes mellitus, and an adjustment disorder with depression and anxiety."  Tr. 22.

At step three, the ALJ concluded that Collins does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 24. The ALJ then found that Collins has the RFC to perform light work, and "can only lift and carry 10 pounds frequently and 20 pounds occasionally," "can sit, stand and walk for up to 6-hours in each activity (cumulatively, not continuously) in an 8-hour workday with normal breaks," and "could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and reach overhead." Tr. 25. However, she "could never climb ladders, ropes, or scaffolds" and is "limited to performing unskilled work and routine tasks." *Id*.

Based upon the testimony of a VE, the ALJ determined at step four that Collins's RFC precluded her from returning to her past relevant work. Tr. 29.

At step five, the ALJ found that considering Collins's age, education, and RFC, she was capable of performing the light, unskilled jobs of Office Helper and Storage Facility Rental Clerk. Tr. 31.

Accordingly, the ALJ determined that Collins was not disabled at any time during the closed period.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v.*

*Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## <u>MEDICAL RECORDS</u>

In 1987, gastroenterologist Kenneth Flora, M.D., diagnosed Collins with hepatitis C from a blood transfusion.  Tr. 464.

She also suffers from a congenital cervical spinal fusion that led to degenerative disc disease.  Tr. 373.  On November 16, 2000, an MRI of her cervical spine  showed "moderate to severe central canal narrowing with cord flattening and significant narrowing of the right neural foramen" at C5-6, and a mild bulging disc eccentric to the right "where it causes mild narrowing of the right neural foramen" at C6-7, in addition to her congenital fusion at C3-4. Tr. 547.  In 2001, after corticosteroids and physical therapy proved ineffective to treat her disc disease, Collins underwent a cervical spine fusion surgery.  Tr. 376.[3]  The treatment was intended to stabilize her neck and prevent future paralysis from any possible acute trauma.  Tr. 85-86.  As a result, Collins's grip strength improved, and she was able to start driving on a limited basis.  Tr. 46.  However, she continued to experience "lots of pain" after the surgery.  Tr. 379.

---

[3] Records from the neurosurgeon, Dr. Calhoun, were apparently unavailable because his office closed after several malpractice lawsuits.  Tr. 85.

On February 5, 2003, chiropractor David Mealey, D.C., began treating Collins for chronic head and neck pain and left arm paresthesia (tingling). Tr. 457. He treated Collins for the same symptoms seven more times through June 2003. Tr. 454-57.

At an October 24, 2003 annual exam, Collins described her depression to Brenda Kehoe, M.D. Tr. 365-66. She reported being "emotional, overwhelmed, incapable of coping, [could not] answer calls, or talk to people." Tr. 365. "[E]vents at work that are actually trivial seem huge" and she felt "isolated." *Id.* Upon palpation, Dr. Kehoe found Collins "very tender on the left side" with "swelling in the region of the left anterior cervical neck chain." *Id.*

On February 27, 2004, Dr. Mealey again treated Collins for acute pain and noted palpable tenderness in her shoulders. Tr. 453. When Collins's symptoms had not changed after several more treatments in April 2004, Dr. Mealey referred her to a primary care physician. Tr. 452.

On April 30, 2004, Collins sought treatment from Lauren Roberts, M.D., at Portland Family Practice. Tr. 379. She had been experiencing severe pain neck and arm pain for four weeks, could barely lift her left arm, and was tearful and tense. *Id.* Repetitious movement was especially painful. *Id.* To help her work, she had taken Oxycontin three or four times, but stopped because it caused nausea. *Id.* Dr. Roberts assessed Collins as suffering from chronic pain, depression, and diabetes mellitus. *Id.* She prescribed Celexa for depression, Norco for pain, and told Collins to return in a month to address her depression. *Id.* That same day, Collins was treated by Dr. Mealey for shooting pain into her head. Tr. 451.

On May 28, 2004, Collins reported to Dr. Roberts that the Celexa was working well. Tr. 377. Her depression was better now that her neck was feeling better. *Id.* Dr. Roberts noted that Collins was better attending to her diabetes by walking on the treadmill and watching her diet. *Id.*

Dr. Mealey continued to regularly treat Collins for her chronic neck pain from June 2004 through early 2005 with no major changes in her condition. Tr. 443-450. On February 18, 2005, Collins complained of left hip and thigh pain that emerged two weeks earlier. Tr. 442. Dr. Mealey treated her four times in March 2005 before her leg pain improved, but it returned by April 5, 2005. Tr. 440-42. Collins told Dr. Mealey that she was taking up to three Vicodin per day to manage her pain and was worried about the toxicity of her dosage. *Id.* On April 26, 2005, Collins reported that twice her legs had "given out" causing her to collapse from "intense pain." Tr. 438. Dr. Mealey continued to treat Collins through June 2005. Tr. 435-38.

On June 6, 2005, Collins sought treatment at Gresham Urgent Care with Charles Wong, M.D., reporting neck spasms after a fall. Tr. 404. Dr. Wong prescribed an increased dosage of Norco. *Id.* On August 29, 2005, Collins complained of "popping under her left breast." Tr. 403. Dr. Wong ordered X-rays of Collins's chest which revealed "a focal sclerotic lesion within the proximal left humerus, most likely representing a bone infarction." Tr. 419-20.

Collins continued to receive at least bi-monthly treatment from Dr. Mealey throughout the rest of 2005 with no change in her symptoms. Tr. 426-33. On December 6, 2005, she told Dr. Mealey she was unable to return to work and was applying for long-term disability. Tr. 427.

On September 12, 2005, Collins returned to Dr. Wong for follow-up X-rays of her left shoulder which revealed a bone infarction or possibly an enchondroma (benign cartilage tumor).

On September 14, 2005, Collins returned to Dr. Roberts for pain in her left chest, shoulder, and hip.  Tr. 376.  Collins reported that the higher dosage of Norco prescribed by Dr. Wong helped the pain.  *Id.*  Her diabetes labs were "excellent" reflecting her lifestyle changes, but her blood pressure was elevated.  Tr. 376, 385 (lab).  Dr. Roberts opined that Collins might suffer from a humoral infraction, ordered another X-ray of her shoulder, continued the Celexa and Norco, and told Collins to return in six months.  *Id.*

On October 10, 2005, Collins saw Dr. Wong for right rib pain after "reaching over [the] car" three days before.  Tr. 401.  Dr. Wong did not change her treatment, noting that she was scheduled for another X-ray.  *Id.*

On November 9, 2005, Collins returned to Dr. Wong for follow-up X-rays of her left shoulder which confirmed "a reticuloform sclerotic lesion in the proximal metaphysis of the left humerus" and assessed as a bone infarction.  Tr. 414.  Collins reported "soreness in her neck, increased pain in her left arm down to her elbow, and that Advil was not helping."  Tr. 400.  Dr. Wong ordered a MRI of the left shoulder which again confirmed a bone infarction with mild tendinosis.  Tr. 400, 415-416 (MRI interpretation).

On November 16, 2005, Collins told Dr. Wong that her bilateral shoulder and arm pain had become severe three days ago with rashes and swelling in her extremities and that she was "concerned that this ha[d] been going on for several years" and was getting "progressively worse."  Tr. 399.  Dr. Wong observed mild edema (swelling) in her right forearm and an inability to externally rotate beyond 60 degrees.  *Id.*  He also noted the

possibility of an autoimmune disease and on December 14, 2005, referred her to a rheumatologist. Tr. 398-99.

Dr. Mealey continued to treat Collins throughout 2006 with no change in her symptoms. Tr. 421-23, 425, 517.

On February 7, 2006, rheumatologist Elizabeth A. Tindall, M.D., examined Collins. Tr. 373-74. Collins reported she had disability insurance, saw a chiropractor weekly for nerve stimulation, and had never attended a pain clinic. Tr. 373. She had been taking Celexa for depression and Ibuprofen, Vicodin, and Oxycontin for pain. *Id.* Upon examination, Dr. Tindall observed decreased range of motion in Collins's neck, a normal joint exam, but "multiple myofascial tender trigger points present through the upper and lower back musculature and extremities as well." *Id.* She diagnosed Collins with fibromyalgia, but found no evidence of rheumatoid arthritis or systemic lupus erythematosus. Tr. 374, 390-94. Dr. Tindall prescribed Flexeril and a transcutaneous electrical nerve stimulation ("TENS") unit rental for six weeks, and referred Collins to gastroenterologist Jeff Albaugh, M.D., for her hepatitis C. *Id.*

A month later, on March 6, 2006, Collins returned to Dr. Roberts complaining of bilateral arm pain and swelling, and pain in her hips that made it "hard to walk even to the car" because her "legs gave out." Tr. 375. Dr. Roberts increased the Norco dosage and noted that she would order a pain clinic consultation. *Id.* However, the record does not contain that order.

One year later, on March 16, 2007, Dr. Mealey completed a "Physical Capacities Evaluation" describing that Collins could sit, stand, and walk for two hours in an eight-hour workday; could use her left, but not her right, hand for all activities; lift and carry up to five

pounds frequently, and six to 20 pounds occasionally; and never climb, but occasionally balance, stoop, or kneel.  Tr. 503-04.  Dr. Mealey concluded that Collins's pain was reasonably based on the chronic effects of her neck surgery, such that she could not work full time.  Tr. 505.

On April 23, 2007, Collins told Dr. Roberts that she was taking Norco three times a day, half of the dosage of muscle relaxants, and Flexeril to sleep, but was still experiencing "a lot of pain."  Tr. 509.  Dr. Roberts referred her to Laura H. Davies for her chronic pain. Tr. 511.

On April 27, 2007, Collins went to Gresham Urgent Care for right wrist pain. Tr. 545.  The attending doctor ordered a bone scan, which was inconclusive as to the cause of the pain.  Tr. 544.  On May 9, 2007, Collins told Dr. Roberts that she had a new medication for her wrist pain (Sulindac).  Tr. 507.  Because the Oxycontin was causing her nausea, Dr. Roberts started a morphine tablet.  Tr. 507-08.  On June 8, 2007, Collins reported that because the morphine was not effective, she also took Norco.  Tr. 523.  Dr. Roberts noted that Collins had De Quervain's tenosynovitis[4] in her right wrist.  *Id.*

On November 17, 2007, Dr. Mealey treated Collins again without changes in her condition.  Tr. 518.

The next year, on August 11, 2008, Collins sought treatment from Dr. Roberts for right wrist pain after receiving treatment at Gresham Urgent Care three weeks before. Tr. 535.  She described the pain as sometimes "quite severe" and other times "just annoying," but "[w]orse with repetitive motion."  *Id.*  The wrist was tender and her grip,

---

[4] De Quervain's tenosynovitis is a painful condition affecting the tendons on the thumb side of the wrist. MAYO CLINIC, *De Quervain's tenosynovitis*, http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238 (last visited August 18, 2014).

extension, and flexion strength were diminished, but Dr. Roberts noted it was difficult to

evaluate because Collins was "careful with her wrist" and "holding back." Tr. 537.  Collins

told Dr. Roberts that Standard Insurance had discontinued her disability insurance "because

they think she can [could] go back to work" and asked for a letter about her condition.

Tr. 535.  Dr. Roberts continued Percocet.  Tr. 536.[5]

On August 26, 2008, Collins returned to discuss her disability status.  Tr. 532-

33.  She described that:

> Meds help her function but do not completely eradicate the
> pain.  She is unable to sit for 30 minutes at the computer or if she
> cooks a big meal for dinner, she had lots of pain and is not able to have
> energy that day and after.  She had had a gal come in to help with
> housework.  Her family does chopping and vacuuming and lifting.
> Cannot sit for long, cannot lift and use arms, for more than 15
> minutes sustained.

Tr. 532.

She asked Dr. Roberts to contest her insurer's assertion that she could work with

"reasonable continuity for 8 hours."  *Id.*  On September 8, 2008, Dr. Roberts wrote a letter

stating that Collins "has chronic exhaustion and chronic pain that is exacerbated by even

minor activity.  She is unable to work at this time as she had been for several years.  It is not

expected that her symptoms will remit."  Tr. 531.

On September 29, 2008, Dr. Mealey wrote a similar letter after treating her seven

times earlier that year (Tr. 527-30) without any major change in her condition:

> Mrs. Collin[s]'s has a chronic disabling condition and previous
> attempted returns to work have led to exacerbations of her symptoms.
> Mrs. Collins cannot sustain continued work beyond 30-45 minutes
> because of her ongoing symptoms.  Her radicular symptoms are
> unpredictable and worsened with any attempts to return to normal

---

[5] Although not clear exactly when, Dr. Roberts began prescribing Percocet as early as April 16, 2008.
Tr. 540.

> activities[, for example,] sitting, standing or lying down for a brief
> period[].  During her time as a patient of mine it is apparent . . . she
> has an ongoing disability.  Mrs. Collins will have this chronic
> condition the rest of her life and it is not likely that her condition will
> improve.

Tr. 526.

On August 8, 2009, Dr. Mealey treated Collins, noting no major changes in her symptoms.  Tr. 518.

On January 20, 2010, Avinash Ramchandani, M.D., administered a comprehensive orthopedic exam.  Tr. 705-09.  Collins reported that she had "excruciating pain in her neck," required assistance with dressing, spent the day sleeping a lot, and did no housework "except for light dishes."  Tr. 705-06.  Dr. Ramchandani assessed Collins as having no postural, manipulative, or other limitations.  Tr. 708-09.  Although he observed tenderness to light touch over the posterior left side of the head and pain with extension and rotation bilaterally of the cervical spine, Collins was "able to grip and hold objects securely to the palm by the last three digits" without evidence of myotonia (prolonged muscle contraction), grip release, or diminution of function with repetition.  Tr. 708.

On February 17, 2010, based on a review of the records, Robert Henry, Ph.D., concluded that Collins's had only mild difficulty in maintaining concentration, persistence, or pace, and agreed with the ALJ's initial decision of July 14, 2009, that her depression was not a severe impairment.  Tr. 720-22.  On February 22, 2010, based on a review of the records, Martin Kehrli, M.D., gave "significant weight" to Dr. Ramchandani's analysis and agreed with the ALJ's initial decision that Collins was capable of resuming her paralegal work.  Tr. 731.

On May 13, 2010, Collins reported to Dr. Roberts that she was trying to reduce her use of pain medications. Tr. 765. She was "trying to work part-time and a modified job," even though it hurt and she needed to rest often. *Id.* She also said that her family was having financial difficulties. *Id.*

On August 22, 2011, after the remand by the Appeals Council, David Gostnell, Ph.D., performed a psychodiagnostic examination of Collins for Disability Determination Services. Tr. 736-46. At that time, Collins described her daily life as:

> generally independent for her grooming, hygiene, and dressing, by using "tricks," such as velcro and other conveniences, although her husband sometimes must help her with dressing. She and her husband share in the household chores, and she has also hired people with cleaning and yard work. She manages her own medications, using a weekly pill box, without a problem. She uses the "Dream Dinners" program, by which meals are planned and prepared in advance, simplifying her cooking responsibilities. Her husband does the dishes. She travels by driving herself, but limits herself because of neck pain. She does her own shopping.

Tr. 738-39.

Dr. Gostnell found that Collins's mental status examination revealed no cognitive impairment, but noted that her depression and anxiety "interacts with her chronic pain and can result in episodic memory and concentration problems, especially in stressful circumstances." Tr. 743. He diagnosed Collins with "Adjustment Disorder with Depression and Anxiety and Pain Disorder Associated with Psychological Factors and a General Medical Condition." Tr. 741. Dr. Gostnell concluded that Collins's mental disorders did not translate to limitations at work, but that her hours were "limited by physical problems." Tr. 744.

On January 6, 2011, Collins reported to Dr. Roberts that she had been working again and reported moderate fatigue. Tr. 758.

Returning on June 13, 2011, Collins reported that she was still using morphine but needed less Percocet.  Tr. 751.  Dr. Roberts continued the morphine and decreased the Percocet dosage.  Tr. 754.

At the time of the second hearing, Collins was unemployed.  Tr. 42-43.  The Union had terminated her employment in December 2010 due to financial cut-backs.  Tr. 22, 42-43.

## DISCUSSION

Collins argues that the ALJ erred by improperly discounting her subjective pain testimony and the lay testimony of Stoner, her former supervisor.  For the reasons that follow, this court concludes that the ALJ erred by omitting the intensity and limiting effects of Collins's pain.  If the testimony of Collins and Stoner is properly credited, a finding of disability is mandated.

## I.    Collins's Credibility

### A.    Legal Standards

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  A general assertion that the plaintiff is not credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence." 20 CFR § 404.1529(a). Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). This standard "is the most demanding required in Social Security cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F3d 920, 924 (9th Cir 2002).

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid. *Tommasetti v. Astrue*, 533 F3d 1035, 1040 (9th Cir 2008).

Credibility determinations are within the province of the ALJ. *Fair v. Bowen*, 885 F2d 597, 604 (9th Cir 1989), citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988). Where the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, the role of the reviewing court is not to second-guess that decision. *Id.*

**B.    Testimony**[6]

Before and during the period at issue, Collins experienced severe neck pain, shoulder pain, pain radiating down her right arm, some pain in her left arm, and an inability to grab and hold onto things with her right hand. Tr. 45.

---

[6] This summary combines Collins's testimony at the June 24, 2009, and December 5, 2011, hearings.

16 – OPINION AND ORDER

The fusion surgery in 2001 improved her grip strength, but did not significantly affect her pain.  Tr. 46.  Afterwards she felt pain and limitations in both hands.  Tr. 47. Collins took two years to recover from the surgery and when she returned to work, her condition deteriorated.  *Id.*  Severe pain in her upper body made her so tired that she was falling asleep at her desk and sleeping in her car during lunch.  Tr. 47, 78.  The Union accommodated Collins's fatigue by allowing her to telework from home.  Tr. 47.  She could also work at her own pace and rest in between 30-minute intervals of work.  Tr. 48.  By the time she quit in 2005, she worked at home two days per week.  *Id.*

The Union also accommodated Collins at the office.  She could take naps in her office, had a custom-designed chair with neck, arm, and lumbar support, and an electric stapler.  Tr. 49.  An assistant helped her lift books and perform repetitive motions, such as opening and closing.  *Id.*  She also was free to vary her work schedule to avoid repetitive movements and sitting longer than 20 minutes.  *Id.*  Despite these accommodations, Collins was not completing her work, and the Union hired a second person to cover for her.  Tr. 50. When Collins felt the job was too physically demanding for her, she quit.  *Id.*  She would have quit sooner had she been required to work at the office every day.  Tr. 48.

She planned to take off work only 18 months to a year.  Tr. 78.  Instead, her condition deteriorated after she quit with increasing pain in her lower body, and she was diagnosed with fibromyalgia soon afterwards.  Tr. 50.

During the next four years, Collins spent most of her day resting in bed or in the recliner that supported her neck.  Tr. 52-53.  She could do only light housework.  Her son vacuumed and cleaned the toilets, and she hired someone to clean the house once a week. Tr. 57.  Collins's husband prepped all the meals by chopping and mixing the ingredients, so

that she only had to stir or "quick cook an item." *Id.* Her son and husband loaded and unloaded the dishwasher. Tr. 81. She could load the washing machine but needed someone to transfer the wet clothes to the dryer. *Id.* Collins was able to shop for a few things at a time, but any "major shopping" required her husband's help. *Id.* She ate meals in the recliner with her neck supported and gave up reading which required her to put her head down. Tr. 82. Collins tried to stay as active as possible to prevent her body from "lock[ing] up." *Id.* During this time, she could only pick up five pounds repeatedly, sit or stand for one hour, walk for 20 minutes, and type for 15 minutes. Tr. 82-83. In between, she rested for 20-30 minutes. Tr. 88. She dropped things held in either hand and picked up coins by "brushing them towards" her. Tr. 87.

Collins required assistance with dressing, and her husband helped her pull on clothing and socks. Tr. 79-80. She otherwise adapted by wearing clothing without buttons and ties, opting for Velcro, and using a long shoehorn to put on her shoes. Tr. 81. When she visited her father, she brought a friend to help her drive and dress. Tr. 80. She socialized with friends when they came to her house and saw only one 80-year old friend outside the house when Collins drove her son to youth group. Tr. 57-58. She also attended church every Sunday. Tr. 58.

Collins's salary was necessary to supplement her husband's income and provided health care and retirement benefits for the whole family. Tr. 51. After she quit work, they were forced to declare bankruptcy. *Id.* For this reason, she is "extremely" motivated to continue working. *Id.* She received long-term disability benefits from the Union's insurance provider for the first three years after she quit. Tr. 79. Collins was insured initially through her COBRA (Consolidated Omnibus Budget Reconciliation Act)

continuation health coverage, until she switched to a less-expensive, high-deductible, private insurance plan, discouraging her to seek treatment. Tr. 55. Instead, she treated herself with heat and ice packs, a TENS unit, and a massage device. Tr. 80.

Her fibromyalgia symptoms improved only after four years of not working. Tr. 51. She noticed her overall body pain improving, and eventually stopped taking her muscle relaxants. Tr. 52. Her stamina also improved to the point that she could take a walk after breakfast instead of resting afterwards. Tr. 53. She does not believe she would have recovered without the rest. *Id*.

On April 30, 2010, she returned to work at the Union part-time for 14-20 hours per week. Tr. 53. She continued to work from home as many as 16 hours a week and had complete control over where she worked. *Id.* By December 2010, when she was laid off, she was working 30-32 hours per week. Tr. 54.

At the time of the hearing, Collins was still taking morphine and Percocet for breakthrough pain. Tr. 56.

**C.    Analysis**

The ALJ did not specifically find that Collins was malingering, but did note that she "exaggerated that she was working almost full-time from home" during her psychiatric evaluation and testing with Dr. Gostnell in 2011. Tr. 26. This statement misinterprets the record. According to Dr. Gostnell's records, Collins's only mention of her work schedule was that "she ha[d] returned to work as a legal secretary with her previous employer, who accommodates . . . her physical limitations with flexible hours." Tr. 740. This mischaracterization of Dr. Gostnell's chart note provides no evidence of malingering and

did not relieve the ALJ of the requirement to provide clear and convincing reasons for discrediting Collins's testimony.

The ALJ also did not expressly find Collins not credible, but did give general reasons to discredit her subjective pain testimony. First, the ALJ found that Collins's daily activities conflicted with her testimony about shooting pain in her right arm and diminished concentration. Tr. 27. In support, he cited her activities of personal grooming, household cleaning and cooking, driving, use of public transportation, visiting with friends over the phone and in person, attending church, watching television, reading, and playing games as activities that undermined her claim of being unable to return to work. *Id.*

The ALJ's reference to Collins's reading ability is incorrect. Collins testified that her neck pain forced her to give up reading because it required bending her neck down. Tr. 82.

In addition, Collins's ability to leave the house to socialize and worship are not evidence of functionality transferrable to the workplace. "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Smolen*, 80 F3d at 1287 n7. Collins did not testify, and her medical providers never found, that her chronic pain limited her mobility or independence. Her socializing is consistent with her fatigue symptomology because she only visited one friend once a week and combined that visit with dropping her son at youth group to avoid driving more than necessary. Tr. 57-58. Likewise, attending church once a week is hardly indicative of an active social life.

Her daily routine is more relevant evidence of her ability to work. Collins received assistance in almost everything she did at home, and her activity level depended entirely on resting up to three hours in her recliner each day. Tr. 88. Collins could dress herself only

with assistance.  Tr. 79-81.  In fact, her dressing limitations were so consistent that she even had to bring a friend along on a trip to assist her.  Tr. 80.  As a result, had she worked during the closed period at issue, she would have required support, as she received at the Union, to perform workplace tasks that required repetitive movement and lifting, frequent rest breaks, and a flexible schedule.  "[M]any home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."  *Smolen*, 80 F3d at 1287 n7.

Collins's contributions to the household were equally consistent with her alleged limitations.  When questioned by the ALJ, Collins described her only household activities as loading the washing machine, finishing the meals that her husband or son had prepared, and buying a few groceries.  Tr. 81.  She could not load the laundry into the dryer, vacuum, clean the toilet, load or unload the dishwasher, or complete a full grocery shopping trip.  *Id.*

The ALJ specifically cited Collins's two-week cruise sometime before November 2008 as indicating her "fairly normal activities of daily living."  Tr. 26.  "Recognizing that 'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations,' the Ninth Circuit has held that '[o]nly if [her] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on [her] credibility.'"  *Garrison v. Colvin*, -- F3d --, 12-15103, 2014 WL 3397218, at *17 (9th Cir July 14, 2014), quoting *Reddick v. Chater*, 157 F3d at 722 (alteration in original).  Presumably, her cruise did not require her to perform any repetitive motions and she was able to rest as needed.  And because Collins's pain was primarily in her upper extremities, she could walk without pain as long as she rested afterwards.  Tr. 87-88.  In fact, she walked as much as

possible to prevent her body from "lock[ing] up." Tr. 82. The activities associated with a cruise do not suggest that she was exaggerating her claimed limitations.

Second, the ALJ reasoned that Collins's ability to return to the Union and resume skilled work "undermines her diffuse pain claims and alleged symptomology as an obstacle to working." Tr. 26-27. The regulations allow for a nine-month trial work period when claimants can attempt to work without losing their disability status. 20 CFR § 404.1592(a). After returning to work in April 2010, Collins indicated to Dr. Roberts that she had resumed work as a trial under the impression that working for a short time would not affect her disability application. Tr. 765. Collins never reached the nine-month mark at the Union because she was laid off in December 2010. Tr. 22.

Regardless of how long Collins worked after the closed period, it is irrelevant to her credibility because she returned to work under the same conditions as before she quit. In 2010, the Union gave Collins many of the same accommodations she had before 2005, notably a flexible schedule and teleworking privileges. Tr. 43. She worked only part-time, starting at 14-20 hours and eventually increasing to 30-32 hours per week. Tr. 54. Nevertheless, she was never working at full capacity, even for a part-time employee, because her productivity was only 80%. Tr. 65. The ALJ credited this testimony. Tr. 22 (even with "numerous accommodations" her "productivity is only at 80% compared to a normal employee"). Moreover, she was still working through pain and taking morphine and Percocet. Tr. 765-66.

The ALJ's third reason to reject Collins's pain testimony was based on the lack of medical evidence to explain her decision to quit work in 2005. Tr. 27. Contrary to the ALJ's characterization that the "medical evidence does not demonstrate a change in her

condition at the time that she ceased her employment" (*id*), the record shows that Collins's

pain grew increasingly worse from 2001 to 2005, culminating in a fibromyalgia diagnosis in

2006. Tr. 373-74. The Ninth Circuit has held that an ALJ cannot require objective evidence

for a disease such as fibromyalgia that "eludes such measurement," and that "is diagnosed

entirely on the basis of patients' reports of pain and other symptoms." *Benecke v. Barnhart*,

379 F3d 587, 590, 594 (9th Cir 2004). Collins began reporting fibromyalgia signs

(tenderness, chronic pain, tingling, and numbness) to her chiropractor and primary care

providers in 2003. Tr. 265-66, 457; *see* Social Security Ruling, 12–2p, 2012 WL 3104869

(July 25, 2012) (describing symptoms and signs of fibromyalgia). Moreover, her delay in

quitting was motivated by her need to provide health insurance for her family. Tr. 58.

Thus, substantial evidence before and after Collins quit in 2005 corroborates her testimony

that it became too painful for her to work.

To the extent the ALJ relied on the discontinuation in 2008 of Collins's employer-

provided disability benefits (Tr. 26), that fact does not support the ALJ's credibility finding.

> A decision by any nongovernmental agency or any other governmental
> agency about whether [the claimant is] disabled or blind is based on its
> rules and is not [the Commissioner's] decision about whether [the
> claimant is] disabled or blind. . . . Therefore, a determination made by
> another agency that [the claimant is] disabled or blind is not binding
> on [the Commissioner].

20 CFR § 404.1504.

The disability insurer concluded that Collins could "do some work and that she [had]

to try to find some work that she [could] do." Tr. 26. However, the ALJ does not indicate

the criteria or objective evidence supporting this conclusion. Without evidence that the

insurer's determination is transferable to the social security context, it is unpersuasive.

As a fourth reason, the ALJ noted Collins's apparent lack of motivation to seek treatment for her pain.  Tr. 27.  Specifically, the ALJ found that Collins did not seek treatment until 2008 when she "knew she was going to lose her long-term disability" insurance.  *Id.*  However, Collins received continuous treatment for neck, back, arm, and leg pain from her chiropractor, Dr. Mealey, from 2003 through 2009.  Tr. 421-57, 527-30, 518.  She also complied in attending scheduled examinations with her primary care provider, Dr. Roberts; was prescribed Ibuprofen, Vicodin, and OxyContin for her pain (Tr. 373); and regularly sought emergency care for breakthrough pain at Gresham Urgent Care.  Tr. 395-414.

The only break in treatment occurred in 2008 and 2009 after Collins lost her disability benefits, switched to a high-deductible health care plan, and lacked funds for consistent medical care.  The Ninth Circuit proscribes "the rejection of a claimant's complaints for lack of treatment when the record establishes that the claimant cannot afford it."  *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F3d 1294, 1297 (9th Cir 1999).  The loss of the additional disability income dramatically reduced her visits to Drs. Roberts and Mealey regarding her chronic pain.  Tr. 55.  Even then, Collins occasionally sought chiropractic and medical treatment (Tr. 535, 40, 518), while mainly self-treating with heat and ice packs, a TENS unit, and massage device.  Tr. 80.

The ALJ also cited Collins's failure to pursue the referral for a nerve conduction study after she developed wrist pain.  Tr. 27.  On August 11, 2008, Collins told Dr. Roberts that Gresham Urgent Care had ordered a nerve conduction study that she had "not done."  Tr. 535.  A nurse practitioner at Gresham Urgent Care advised Collins to see Dr. Roberts.  Tr. 543.  The record of the urgent care visit contains an order for a wrist brace but not for a

nerve conduction test. *Id.* When asked at the hearing, Collins did not remember the recommendation for the nerve conduction testing. Tr. 56. Given that it is unclear whether the nerve conduction study was ordered and that Dr. Roberts did not find the study sufficiently important to order it herself, Collins's alleged failure to pursue the study is not a convincing reason to find her unmotivated to treat her pain.

Overall, the ALJ's treatment of Collins's testimony is an example of the common failure to realize the distinction between activities of daily living and activities in a full-time job. As recently reemphasized by the Ninth Circuit, the "critical difference" is that "a person had more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Garrison*, 2014 WL 3397218, at *17, quoting *Reddick*, 157 F3d at 722. Collins's subjective pain and symptom testimony is completely consistent with her description of daily activities such that the ALJ's reasons for finding her less than credible were neither clear nor convincing.

## II.    **Lay Witness Testimony**

### A.    **Legal Standards**

To reject lay witness testimony, the ALJ "must give reasons that are germane to each witness." *Molina v. Astrue*, 674 F3d 1104, 1114 (9th Cir 2012), citing *Dodrill*, 12 F3d at 919. Under Ninth Circuit law, the ALJ may not "discredit . . . lay testimony as not supported by medical evidence in the record." *Bruce v. Astrue*, 557 F3d 1113, 1116 (9th Cir 2009), citing *Smolen*, 80 F3d at 1289 ("The rejection of the testimony of [the claimant's] family members because [the claimant's] medical records did not corroborate her fatigue and pain violates SSR 88-13, which directs the ALJ to consider the testimony of lay

witnesses where the claimant's alleged symptoms are *unsupported* by her medical records."

(alteration in original)).

### B.    Testimony

Stoner, the Union's general counsel, provided an affidavit dated September 17, 2008

(Tr. 315-16), and also testified at the December 5, 2011 hearing.  Tr. 59-65.  Collins worked

for Stoner from 1992 until she quit in 2005, and then again when she returned in 2010.

Tr. 59, 315.  Before 2005, Stoner observed that Collins was in constant pain, had

"increasingly intense periods of fatigue," "was having problems with cognition," and "was

making mistakes."  Tr. 60.  "[M]ostly she was just so incredibly ill.  That was real obvious."

*Id.*  Her skin complexion was "dead white and slightly green" all the time.  *Id.*  Despite how

she felt, Collins did not talk about her illness.  *Id.*  Stoner detailed more accommodations,

namely a special keyboard and mouse, a chair massage device, and another "device that

provided heat for her neck."  *Id.*  Stoner described Collins's "incredible work ethic" who

gave "110 percent."  Tr. 61.  However, by the time she quit in 2005, Collins was only

performing at 25% capacity, and the Union discussed replacing her.  Tr. 64.  "She had

absolutely no stamina.  She would come to work after maximizing her rest period and within

three hours would be exhausted and ashen-faced."  Tr. 316.

Stoner saw Collins during the four-year gap and observed that her symptoms had not

improved, although she was functioning better by resting more.  Tr. 63-64, 316.  "It is very

clear that she continues to have no stamina and is in considerable pain.  It is not unusual for

her to arrive for a luncheon appointment, and by the end of that appointment be visibly

fatigued and exhausted."  Tr. 316.  When Collins returned to the Union in 2010, she was

still only performing at 80-85% of her original capacity.  Tr. 65.  Stoner testified that,

despite Collins's termination, the Union would "hire her back if she's up for it."  Tr. 64.

   **C.    <u>Analysis</u>**

   The ALJ gave Stoner's testimony "little weight" for several reasons.  Tr. 28.  First,

the ALJ found she lacked objectivity to give reliable testimony about Collins's pain.  *Id*.

While it is true that Stoner advocated for Collins both in her affidavit ("I cannot imagine

any type of job that she could work with reasonable continuity." (Tr. 316)) and at the

hearing ("I know there's no job she could have done." (Tr. 65)), overseeing Collins's work

for 13 years gave her a unique and intimate perspective on Collins's ability to function in a

work setting.  "Descriptions by friends and family members in a position to observe a

claimant's symptoms and daily activities have routinely been treated as competent

evidence."  *Sprague v. Bowen*, 812 F2d 1226, 1232 (9th Cir 1987) (citation omitted).

"Disregard of this evidence violates the Secretary's regulation that he will consider these

observations by non-medical sources as to how an impairment affects a claimant's ability to

work."  *Dodrill*, 12 F3d at 918-19, citing 20 CFR § 404.1513(c)(2).  Stoner tolerated

accommodation of Collins's pain and fatigue, despite such changes inevitably affecting own

her work schedule, and was undoubtedly aware of Collins's change in work productivity

over time.  And while Stoner was most familiar with Collins's limitations before she quit in

2005, the medical records show that Collins's condition did not improve until 2010 when

her pain decreased sufficiently for her to return to work.  And even then, she returned to

work while enduring pain, with accommodations and with a modified schedule.  It is only

rational to conclude that Collins's limitations at the Union in 2005, as observed by Stoner,

would have been present at any job she held during the disability period. For these reasons, Stoner's testimony was reliable and highly relevant to the disability determination.

The ALJ also found Stoner lacked "the expertise to testify as to vocational matters and the availability of jobs" accessible to Collins. Tr. 28. Stoner testified that Collins was unable to perform jobs associated with "sedentary work" or even "light work" listed in the *Department of Labor's Dictionary of Occupational Titles*. Tr. 315-16; *see* 20 CFR Pt. 404, Subpt. P, App. 2 (Medical-Vocational Guidelines). The ALJ may only consider the expertise of the VE or other specialists in determining representative occupations suitable for a claimant's identified RFC. 20 CFR § 404.1566(e). Thus, the ALJ did not err by rejecting Stoner's testimony as to Collins's ability to meet those standards. However, in light of Stoner's first-hand observations, the ALJ erred in rejecting her testimony about Collins's exertional limitations and lack of stamina in the workplace. *See* 20 CFR § 404.1513(d)(4) (evidence provided by lay witnesses may be used to show "the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work").

To reject Stoner's testimony, the ALJ also relied on the lack of supporting medical evidence and Collins's inconsistent daily activities. Tr. 28. Citing Collins's ability to do some grocery shopping, cook meals, and groom, the ALJ dismissed Stoner's testimony that Collins could lift no more than one pound. *Id*. Although this is a rational interpretation of the evidence deserving of the court's deference, *see Tommasetti*, 533 F3d at 1038, it was error to isolate this one inconsistency from the other competent testimony that is strikingly consistent with Collins's activities. *See Gallant v. Heckler*, 753 F2d 1450, 1456 (9th Cir 1984) (the ALJ "cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result."); *see also Reddick*, 157 F3d at 723

("paraphrasing of record materials is not entirely accurate regarding the content or tone of the record"). As thoroughly explained above, Collins was severely restricted in daily activities that requiring lifting or manipulating with her arms and hands, consistent with her complaints of upper extremity pain throughout the medical record. Specifically, Collins could not completely dress herself and could only shop for a couple groceries at a time.

Most importantly, Stoner's testimony echoes the fatigue that Collins described to justify her need to rest throughout the day. Stoner stated that Collins had "absolutely no stamina," "would come to work after maximizing her rest period and within three hours would be exhausted and ashen-faced," and "took to sleeping in her car during lunch to try to recover enough that she could finish the day." Tr. 316. The ALJ rejected this testimony because Collins's activities required "some stamina." Tr. 28. Again, the ALJ took Stoner's testimony out of context. Stoner's description of Collins's work pattern is entirely consistent with Collins's testimony that her energy level depended on her ability to rest between activities. Both before 2005 while working (Tr. 47-48) and during the closed period, Collins consistently rested before exerting herself. Tr. 83-84. This pattern both necessitated accommodations of teleworking and a flexible schedule at the Union and limited her ability to perform chores at home.

Because Stoner's testimony overall is consistent with the medical record and Collins's own testimony, the ALJ erred in affording it little weight.

## III.   <u>Remand for Benefits</u>

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of

benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id*.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id*, quoting *Benecke v. Barnhart*, 379 F3d 587, 590 (9th Cir 2004). The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003). The reviewing court declines to credit testimony when "an outstanding issue" remains. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by rejecting the testimony of Collins and Stoner. If this testimony is credited, substantial evidence in the record supports the conclusion that Collins cannot perform her past relevant work and, indeed, can perform no work due to her pain and fatigue.

The ALJ limited Collins to "unskilled work and routine tasks." Tr. 25. However, those restrictions appear to be based on non-physical impairments of her adjustment disorder with depression and anxiety. With respect to physical impairments, the VE did not

consider Collins's need to rest through the day or have flexibility in varying her tasks to avoid repetition.  Tr. 67.  Yet the medical evidence since 2005 documented that repetitive motion aggravated Collins's pain.  *See, e.g.*, Tr. 535 ("Repetitive motion is one of the big issues.").  "A vocational expert's testimony in a disability benefits proceeding "is valuable only to the extent that it is supported by medical evidence."  *Gallant*, 753 F2d at 1456, citing *Sample v. Schweiker*, 694 F2d 639, 643-44 (9th Cir 1982).  In the context of the two jobs in the national economy the VE found suitable for Collins, routine tasks include copying, stapling, and typing, which is similar to the repetitive tasks she performed at the Union.  Therefore, from the ALJ's conclusion that Collins cannot perform her past relevant work, it is reasonable to infer that she also cannot perform routine tasks associated with being an Officer Helper or Rental Clerk without accommodation.  Tr. 29-31.

When cross-examined, the VE admitted that if Collins "needed to lie down two or three times a day for longer than normal breaks," maintained her low productivity level, and required flexibility to "do her tasks as she needed to do them . . . [s]o she could photocopy when she wanted to and answer the phones when she wanted to," she would not be competitively employable.  Tr. 69-71.  The VE's testimony based on this hypothetical incorporating all of Collins's impairments is the only conclusion supported by the record.  Thus, it is clear that the ALJ would be required to find Collins disabled if Collins's and Stoner's testimony is properly credited.

Based on an exhaustive review of the record, Collins was disabled from all competitive employment during the closed period at issue from February 14, 2005, through April 26, 2010.  She was able to resume her position at the Union only because of the array of accommodations offered by her very obliging employer.  As the VE testified, had Collins

requested the same multitude of accommodations by another employer, she would not be competitively employable.  Tr. 70-71.

## **ORDER**

For the reasons discussed above, the Commissioner's decision is REVERSED and REMANDED for an award of benefits pursuant to sentence four of 42 USC § 405(g).

DATED August 25, 2014.

s/ Janice M. Stewart

Janice M. Stewart
United States Magistrate Judge
